**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GENERAL MOTORS ACCEPTANCE | ) | CASE NO. 4:07 cv 2576 |
| CORPORATION, | ) | |
| | ) | JUDGE SARA LIOI |
| Appellant, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| | ) | |
| CLAYTON D. CLINE, | ) | |
| | ) | |
| | ) | |
| Appellee. | ) | |

The matter before the Court involves an appeal by General Motors Acceptance Corporation ("GMAC" or "Creditor" or "Appellant") of a decision by the United States Bankruptcy Court for the Northern District of Ohio holding $444,105.94 of the total $2,486,996.77 debt owed GMAC by chapter 7 debtor Clayton D. Cline ("Cline" or "Debtor" or "Appellee") non-dischargeable pursuant to 11 U.S.C. § 523(a)(4). GMAC presents two claims of error and asks this Court to reverse the decision of the Bankruptcy Court and hold the entire debt non-dischargeable. Cline has not defended the appeal. The Court has jurisdiction pursuant to 28 U.S.C. § 158(a).

**I. Factual and Procedural Background**

Cline was the majority owner of Mountain Chevrolet, an automobile dealership located in East Liverpool, Ohio. On October 4, 2002, Cline executed a Guaranty in favor of

GMAC (the "Guaranty").[1] Pursuant to the Guaranty, Cline personally guaranteed Mountain Chevrolet's obligations to GMAC. On October 10, 2002, GMAC and Mountain Chevrolet entered into a Wholesale Security Agreement. On March 3, 2005, GMAC and Mountain Chevrolet entered into a General Security Agreement. Pursuant to the terms of the Wholesale Security Agreement and the General Security Agreement, GMAC provided financing for Mountain Chevrolet's vehicle inventory, and, in exchange, obtained a security interest in all the business assets of Mountain Chevrolet, including its vehicle inventory, and the proceeds from all sales out of that inventory. This is known in the industry as "floor plan" financing. Under the Wholesale Security Agreement, Mountain Chevrolet was authorized to "sell and lease the vehicles at retail in the ordinary course of business." When a vehicle was sold, Mountain Chevrolet was required to "faithfully and promptly remit to [GMAC] the amount [GMAC] advanced or have become obligated to advance on [Mountain Chevrolet's] behalf to the manufacturer, distributor or seller[.]"

Beginning in late December 2005, and continuing through January 2006, Mountain Chevrolet transferred one-hundred thirty-one (131) vehicles in which GMAC held a security interest without paying to GMAC the amounts owed on such vehicles under the Wholesale Security Agreement.

Mountain Chevrolet filed a bankruptcy petition under chapter 11 of the Bankruptcy Code on February 27, 2006. Mountain Chevrolet's case was converted to chapter 7 on July 6, 2006. GMAC filed a proof of claim in the Mountain Chevrolet bankruptcy in the amount of $2,486,699.77.

---

[1] Unless otherwise noted, this statement of facts is taken from the Memorandum Opinion issued in this case by the United States Bankruptcy Court for the Northern District of Ohio, the Honorable Kay Woods, dated July 24, 2007.

Cline filed a chapter 7 petition on April 17, 2006. Cline scheduled GMAC as having a general unsecured claim in the amount of $2,400,000. GMAC did not file a proof of claim in Cline's case. On August 7, 2006, GMAC initiated an adversary proceeding against Cline, seeking a determination that Cline's debt to GMAC be adjudicated non-dischargeable pursuant to §§ 523(a)(4) or (6). Cline did not answer the complaint, and the bankruptcy court entered default judgment against him on February 26, 2007. On June 13, 2007, the bankruptcy court conducted an evidentiary hearing regarding the amount of GMAC's non-dischargeable damages. At the evidentiary hearing, the Court heard the testimony of Anthony C. Zimmer, the loan specialist employed by GMAC responsible for the Mountain Chevrolet/Cline account. In addition, despite failing to answer the complaint, Cline appeared at the hearing and was permitted to testify.

Following the evidentiary hearing, the bankruptcy court issued a memorandum opinion and order concluding that $444,105.94 of the total $2,486,996.77 debt owed GMAC by Cline was non-dischargeable under § 523(a)(4). Specifically, the bankruptcy court concluded that the vehicle transfers made or authorized by Cline to satisfy Cline's personal obligations constituted larceny of GMAC's property, and therefore the amounts involved in such transfers were non-dischargeable pursuant to § 523(a)(4). The bankruptcy court concluded that the remainder of the vehicle transfers, which comprised the balance of Cline's debt to GMAC, were made or authorized by Cline acting on behalf of Mountain Chevrolet because the transfer proceeds were used to pay corporate debts, and therefore constituted breaches of contract. Such transfers, made in breach of contract therefore could not, as a matter of law, represent tortious conduct. Thus, the amount of Cline's debt related to such transfers was dischargeable. In addition, the bankruptcy court concluded that GMAC failed to present evidence to support a

finding that Cline intended to harm GMAC or knew that injury to GMAC was substantially likely to occur. Accordingly, the bankruptcy court denied GMAC's claim under § 523(a)(6). The instant appeal ensued.

## II. Issues on Appeal

GMAC argues that to the extent that, in limiting the amount of GMAC's non-dischargeable damages, the bankruptcy court differentiated between vehicle transfers made by Cline within, and outside, "the ordinary course of business," the bankruptcy court erred because, as a matter of law, none of the transfers at issue occurred in the ordinary course of business. GMAC also contends that the bankruptcy court erred in concluding that the transfers characterized as breaches of contract could not also represent tortious conduct sufficient to establish non-dischargeability under § 523(a)(4). GMAC does not challenge any of the bankruptcy court's fact findings, nor does it ascribe any error to the bankruptcy court's denial of its claim under § 523(a)(6).

## III. Law and Analysis

### A. Standard of Review

The bankruptcy court's decision regarding nondischargeability is a mixed question of law and fact. *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 875 (B.A.P. 6th Cir. 2001) (citing *Holiday Inns, Inc. v. 800 Reservation Inc.*, 86 F.3d 619, 623 (6th Cir. 1996)). Mixed questions of law and fact are to be "separated into their component parts and reviewed under the appropriate standard." *Mayor of Baltimore v. W. Va. (In re Eagle-Picher Indus., Inc.),* 285 F.3d 522, 527 (6th Cir.), *cert. denied*, 537 U.S. 880, 123 S. Ct. 90, 154 L.Ed.2d 137 (2002). The bankruptcy court's findings of fact are reviewed for clear error and its conclusions of law are reviewed de novo. *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397

F.3d 382, 384 (6th Cir. 2005) (citing *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 433 (6th Cir. 2004)).

Determinations of dischargeability under 11 U.S.C. § 523 are conclusions of law reviewed de novo. *Bailey v. Bailey (In re Bailey)*, 254 B.R. 901, 903 (B.A.P. 6th Cir. 2000) (citations omitted). De novo review requires the Court to review questions of law independent of, and without deference to, the bankruptcy court's determination. *Treinish v. Norwest Bank Minn., N.A. (In re Periandri)*, 266 B.R. 651, 653 (B.A.P. 6th Cir. 2001). However, such conclusions are based upon underlying factual determinations, which must be affirmed unless clearly erroneous. *Bailey*, 254 B.R. at 903 (quoting *Hart v. Molino (In re Molino)*, 225 B.R. 904, 906 (B.A.P. 6th Cir. 1998)). A factual finding is clearly erroneous when, although there is evidence to support it, the reviewing court, based on the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). If two views of the evidence are possible, the trial judge's choice between them cannot be clearly erroneous. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-75 (1985). The bankruptcy judge's findings of fact based on credibility are given particular deference. *Id. See also* Fed. R. Bankr. P. 8013 (on appeal, "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.")

**B. Non-dischargeability under 11 U.S.C. § 523(a)(4)**

In an action to determine the dischargeability of a debt, the creditor bears the burden of proof by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 390 (6th Cir. 2005). Exceptions to discharge are construed strictly against a creditor and liberally in favor of a

debtor. *Rembert v. AT&T Universal Card Servs. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).

The Bankruptcy Code "does not discharge an individual debtor from any debt for [. . .] embezzlement, or larceny."[2] 11 U.S.C. § 523(a)(4). For purposes of non-dischargeability under § 523(a)(4), embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996) (citations omitted). To prove embezzlement, a creditor must establish that (1) he entrusted property to the debtor, (2) the debtor appropriated the property for a use other than that for which it was entrusted, and (3) the circumstances indicate fraud." *Cash Am. Fin. Servs., Inc. v. Fox (In re Fox)*, 370 B.R. 104, 115 (B.A.P. 6th Cir. 2007) (citing *Brady*, 101 F.3d at 1173). The "fraud" required to establish the third element of embezzlement is "fraud in fact, involving moral turpitude or intentional wrong." *Fox*, 370 B.R. at 116 (citations omitted).[3] Proof of embezzlement does not require proof of the existence of a fiduciary relationship. *First Del. Life. Ins. Co. v. Wada (In re Wada)*, 210 B.R. 572, 576 (B.A.P. 9th Cir. 1997) (citations omitted).

"[L]arceny can be defined as the actual or constructive taking away of property of another without the consent and against the will of the owner or possessor with the intent to convert the property to the use of someone other than the owner." *Rowe Oil, Inc. v. McCoy (In re McCoy)*, 189 B.R. 129, 135 (Bankr. N.D. Ohio 1995) (citation omitted). Larceny for purposes of

---

[2] Section 523(a)(4) also excepts from discharge debts for fraud or defalcation by a fiduciary. GMAC's non-dischargeability complaint did not allege that Cline was its fiduciary, and the bankruptcy court did not address GMAC's claim as one involving fiduciary fraud or defalcation. Embezzlement and larceny provide separate grounds for non-dischargeability without requiring proof of a fiduciary relationship. *See Nat'l City Bank v. Imbody (In re Imbody)*, 104 B.R. 830, 840 (Bankr. N.D. Ohio 1989). On appeal, GMAC does not argue that the bankruptcy court erred by failing to address fiduciary fraud or defalcation issues.

[3] *See also Black v. Driggs (In re Black)*, 787 F.2d 503, 507 (10th Cir. 1986) (quoting *Am. Family Ins. Group v. Gumieny (In re Gumieny)*, 8 B.R. 602, 605 (Bankr. E.D. Wis. 1981) ("Embezzlement for purposes of 11 U.S.C. § 523 [. . .] 'requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud.'")

§ 523(a)(4) requires proof that the debtor wrongfully and with fraudulent intent took property from its rightful owner. *Great Am. Ins. Co. v. O'Brien (In re O'Brien)*, 154 B.R. 480, 483 (Bankr. W.D. Tenn. 1993) (citing *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 903 (7th Cir. 1991). "As distinguished from embezzlement, the original taking of the property must be unlawful." *Davis v. Kindrick (In re Kindrick)*, 213 B.R. 504, 509 (Bankr. N.D. Ohio 1997) (citation omitted); *see also Aristocrat Lakewood Nursing Home v. Dryja (In re Dryja)*, 259 B.R. 629, 632 (Bankr. N.D. Ohio 2001). "Larceny is commonly understood to be synonymous with theft. For example, larceny occurs when a thief breaks into a home and steals jewelry for the purpose of converting it to cash for his/her own use." *Whitmore Lake Public Schs. v. CMC Telecom, Inc. (In re CMC Telecom, Inc.)*, 383 B.R. 52, 66 (Bankr. E.D. Mich. 2008).

At the outset of its analysis, the bankruptcy court stated that GMAC relied exclusively upon the Guaranty to establish Cline's personal liability for the debt at issue. (Memorandum Opinion dated July 24, 2007, Doc. No. 1-3, at *22). The bankruptcy court characterized as "fundamental" an apparent distinction between vehicle transfers made by Cline "as a representative of Mountain Chevrolet versus the transfers made by [Cline] in his individual capacity." (*Id.*) According to the bankruptcy court, GMAC argued that in making such transfers, Cline committed embezzlement and larceny; embezzlement when acting on behalf of Mountain Chevrolet, and larceny when acting in his individual capacity. (*Id.* at *22-23). Based on the bankruptcy court's later analysis, it appears that the court agreed with the broad two-category framework advocated by GMAC, i.e., that in authorizing certain transfers, Cline was acting as a Mountain Chevrolet employee, and for others, he was acting in a personal capacity. It further appears that the bankruptcy court assigned particular vehicle transfers to one of the two categories based upon whether the vehicle (as distinguished specifically from proceeds received

as a result of any transfer) was transferred to satisfy a debt of Mountain Chevrolet or a personal obligation. The task of classifying the transfers was a fact-specific analysis, based largely on Cline's testimony. On appeal, GMAC does not challenge any of the bankruptcy court's factual findings or its classification decisions based upon those findings.

Once classified, the bankruptcy court appears to have analyzed the former category of transfers (those made to satisfy Mountain Chevrolet's obligations) as possible embezzlement, and latter category of transfers (those made to satisfy personal obligations) as potential larceny. The former category (hereinafter, the "corporate transfers") was comprised (either completely or partially, it is not clear) of those labeled as "affiliated company," "corporate insider," or "bulk wholesale" transfers. (*Id*. at *25.) With respect to these corporate transfers, the bankruptcy court concluded that such transfers were made in the ordinary course of Mountain Chevrolet's business, rejecting an argument by GMAC that, pursuant to the terms of the Wholesale Security Agreement, sales in the ordinary course by Mountain Chevrolet were limited to those made "at retail." (*Id*.) The bankruptcy court also referenced Ohio state law declaring, generally, that "it is not a tort to breach a contract, no matter how willful or malicious the breach." (*Id*. at *23) (citing *Salvation Army v. Blue Cross & Blue Shield of N. Ohio*, 92 Ohio App. 3d 571, 578 (8th Dist. 1993)). Applying this statement of the law to its conclusion that the corporate transfers were made in the ordinary course of Mountain Chevrolet's business, the bankruptcy court held that "the damages arising from Mountain Chevrolet's failure to remit monies owed to GMAC for these transfers constitute breach of contract rather than fraud, embezzlement, larceny, or willful and malicious injury. Accordingly, the Court rejects GMAC['s] attempts to bootstrap a simple breach of contract claim for these damages into a tort

claim." (*Id.* at *25-26.) The bankruptcy court thus held the amount of the debt related to the corporate transfers was dischargeable. [4]

On appeal, GMAC challenges this conclusion, asserting that the underlying analysis was flawed for two reasons. First, GMAC contends that the bankruptcy court erred as a matter of law in concluding that the corporate transfers occurred in the ordinary course of business. Second, GMAC argues that the bankruptcy court erred in concluding that the corporate transfers, because they represented breaches of contract, could not, for purposes of non-dischargeability, also constitute tortious conduct (specifically, embezzlement).

Because the bankruptcy court did not specifically address the elements of embezzlement, it is difficult to tell whether its conclusion that the corporate transfers occurred in the ordinary course of business actually was used to support its later conclusion that such transfers were not embezzlement. Approaching the embezzlement analysis de novo, it is clear that GMAC entrusted the vehicles in question to Cline, satisfying the first element. The next question is whether the "ordinary course of business" analysis had any bearing on whether Cline

---

[4] With respect to the latter category (the "personal transfers"), the bankruptcy court concluded (confusingly and without analysis) that these did not constitute breaches of contract, and that Cline's "duty" with respect to these vehicles "was imposed by law." (*Id.* at *26). (This is essentially the only reference in the opinion to Cline's "duty", and it is not at all clear how the court reached the conclusion that Cline's duty with respect to this category of vehicles was non-contractual. Furthermore, the larceny analysis does not require a breach of duty as a legal element). The court went on to conclude that the personal transfers constituted larceny, and therefore held the related portion of Cline's debt to GMAC nondischargeable. Of course, GMAC does not challenge this portion of the bankruptcy court's decision. This conclusion almost certainly was incorrect. The hallmark of larceny, as distinguished from embezzlement, is an initial taking that was wrongful. There is no question that Cline did not wrongfully take the vehicles from GMAC in the first instance. They were entrusted to him, in his capacity as an officer of Mountain Chevrolet, pursuant to contract. Nothing resembling a traditional theft occurred in this case. That he later transferred the vehicles (and/or proceeds received from their sale) to satisfy personal, rather than corporate obligations, seems to be a distinction without a difference. (Thus, the takings also may have been embezzlement, but were not larceny). Moreover, contrary to the bankruptcy court's statement, Cline's only duty to GMAC arose out of contract, so it is not clear why the bankruptcy court declined to apply the "it is not a tort to breach a contract" line of Ohio cases to these transfers (though, as explained herein, its application of this rule was itself erroneous). Finally, larceny requires fraudulent intent, but the bankruptcy court expressly found (in assessing whether Cline's actions regarding the corporate transfers were willful and malicious) "no evidence [. . .] that [Cline] intended to harm GMAC or that he knew an injury to GMAC was substantially likely to result from his actions." (*Id.* at *27). This finding is in direct conflict with a finding that Cline had sufficient fraudulent intent to commit larceny. How Cline's intent with regard to the personal transfers could differ from his intent regarding the corporate transfers, the bankruptcy court does not explain. Nevertheless, because this aspect of the decision was not appealed, the Court will not disturb it.

9

"appropriated the property for a use other than that for which it was entrusted[.]" *Fox*, 370 B.R. at 115. The bankruptcy court's opinion does not make this clear. In any event, the Court finds that it was irrelevant whether the vehicles were transferred in the ordinary course of business.[5] The vehicles were entrusted to Cline so that they could be sold and the resulting proceeds could be transferred to GMAC in satisfaction of Cline's debt to GMAC. To that end, the General Security Agreement provided GMAC with a security interest in the proceeds of any sale. There is no question that, in fact, Cline transferred the subject vehicles (and/or funds) in which GMAC held a security interest and did not pay GMAC, irrespective of whether the vehicles or their proceeds were used to pay debts belonging to Mountain Chevrolet or to Cline personally. Either way, as long as the vehicles were not used to pay GMAC, the appropriation by Cline was for a use other than that for which GMAC committed its property. No more did GMAC entrust Cline with the vehicles so he could pay Mountain Chevrolet's heating bill (i.e., a business obligation), than did it entrust the property so Cline could pay to heat his residence (i.e., a personal obligation). From GMAC's perspective, any such use of the property by Cline placed him out of trust. Therefore, to the extent the bankruptcy court relied upon its conclusion that the corporate transfers occurred in the ordinary course of business in finding that Cline did not embezzle GMAC's property, the Court agrees with GMAC that this was error. Based on the undisputed facts, by using GMAC's property for a purpose other than to first pay GMAC what it was owed, in contravention of GMAC's security interest, Cline put the vehicles to a use for which they were not commended. *See Ford Motor Credit Co. v. Marinko (In re Marinko)*, 148 B.R. 846, 850-51 (Bankr. N.D. Ohio 1992) (sale of floor plan vehicles out of trust constituted embezzlement); *Hall v. Blanton (In re Blanton)*, 149 B.R. 394-95 (Bankr. E.D. Va. 1992) (sale of consigned vehicles

---

[5] The Court finds the Ohio statute cited by GMAC, Ohio Rev. Code § 1301.01(I) and GMAC's argument that the transfers were not in the ordinary course of business, equally irrelevant.

and misappropriation of proceeds constituted embezzlement); *see also Universal Pontiac-Buick-GMC Truck Inc. v. Routson (In re Routson)*, 160 B.R. 595, 610-11 (Bankr. D. Minn. 1993).[6] Accordingly, the second element of embezzlement was fulfilled.

Turning to the second claim of error, GMAC contends that the bankruptcy court erroneously held that GMAC's non-dischargeable damages were limited because, under Ohio law, it could not assert a tort claim (embezzlement) based upon conduct that amounted to a breach of contract. In reaching this conclusion, the bankruptcy court relied on Ohio cases stating generally that it is not a tort to breach a contract. *See Schwartz v. Bank One*, 84 Ohio App. 3d 806, 810 (4th Dist. 1992) ("Where the duty allegedly breached by the defendant is one that arises out of a contract, independent of any duty imposed by law, the cause of action is one of contract."); *Salvation Army*, 92 Ohio App. 3d at 578 ("It is not a tort to breach a contract, no matter how willful or malicious the breach.")[7] Notably, it did not cite any bankruptcy cases involving a similar application of Ohio law. To the extent the bankruptcy court viewed such statements of Ohio law as an impediment to finding embezzlement under § 523(a)(4) of the Bankruptcy Code, it did so in error. Whether Cline's conduct amounted to embezzlement for purposes of holding his debt to GMAC non-dischargeable under § 523(a)(4) is a question of federal, not state, law. *See Brady*, 101 F.3d at 1172-73 (noting definition of embezzlement under 523(a)(4) is supplied by federal common law); *see also Klemens v. Wallace (In re Wallace)*, 840

---

[6] There appears, however, to be a split of authority on this issue. *See Bank Calumet v. Whiters (In re Whiters)*, 337 B.R. 326, 332-33 (Bankr. N.D. Ind. 2006); *Bombardier Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 877 (Bankr. D. Colo. 2004). Cases such as *Whiters* hold that security agreements like a typical floor plan financing arrangement do not create an express or technical trust, and, therefore, under the Supreme Court's decision in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934) cannot give rise to embezzlement under 523(a)(4). *Davis*, however, dealt with fiduciary fraud under a predecessor to the Bankruptcy Code. It did not involve an embezzlement claim. This case does not involve a fiduciary fraud claim, and if it did, it would fail because of *Davis*. However, reliance on *Davis* by cases such as *Whiters* for the proposition that an express or technical trust is required before embezzlement can occur is misplaced, and represents a conflation of fiduciary fraud and embezzlement, which are separate grounds for non-dischargeability under § 523(a)(4). The Court finds the cases exemplified by *Marinko* to be reasoned correctly.

[7] This line of cases appears to be rooted in the Ohio Supreme Court's decision in *Ketcham v. Miller*, 104 Ohio St. 372 (1922). *See, e.g., Motorists Mut. Ins. Co. v. Said*, 63 Ohio St. 3d 690, 694 (1992).

F.2d 762, 765 (10th Cir. 1988) (citations omitted); *Graffice v. Grim (In re Grim)*, 293 B.R. 156, 166 (Bankr. N.D. Ohio 2003).[8] The Court perceives no reason why the principle of Ohio law relied upon by the bankruptcy court, which has nothing to do with embezzlement or bankruptcy law, should impact this determination. The cases upon which the bankruptcy court relied have nothing at all to do with federal law, generally, or with bankruptcy, specifically. "The applicability of 11 U.S.C. § 523 is a federal question and, therefore, this court is not precluded from finding embezzlement was committed by the debtor even though the state court judgment included only breaches of contract and fiduciary duty." *Spinnenweber v. Moran (In re Moran)*, 152 B.R. 493, 496 (Bankr. S.D. Ohio) (citing *Damian Mfg. Co., Ltd. v. Corwin (In re Corwin)*, 76 B.R. 221, 223 (Bankr. S.D. Fla. 1987)). Accordingly, under the circumstances, the bankruptcy court erred in applying this principle of Ohio law to GMAC's non-dischargeability claim for embezzlement under § 523(a)(4).

Finally, having examined GMAC's assignments of error, and in the process having found that (1) GMAC entrusted Cline with its property, and (2) Cline put such property to a use for which it was not entrusted, the Court turns to the third and final element of embezzlement: whether the circumstances indicate fraud. As stated previously, this element requires proof of intent to defraud. *Commonwealth of Va. Comm'n of Game & Inland Fisheries v. Myers (In re Myers)*, 52 B.R. 901, 905 (Bankr. E.D. Va. 1985) (citing *Great Am. Ins. Co. v. Storms (In re Storms)*, 28 B.R. 761, 765 (Bankr. E.D.N.C. 1983)).[9] In its embezzlement analysis,

---

[8] State law applies to establish the debt, while federal law applies to determine whether the debt is dischargeable in bankruptcy. This case raises no issue regarding the validity of the debt.

[9] The requisite degree of fraudulent intent is not exactly clear. Compare *Nat'l City Bank v. Imbody (In re Imbody)*, 104 B.R. 830, 841 (Bankr. N.D. Ohio 1989) (citations omitted) ("Most courts that have considered the issue have held that acting with deceit will satisfy the fraudulent intent requirement") with *Discount Home Center, Inc. v. Turner (In re Turner)*, 134 B.R. 646, 658 (Bankr. N.D. Okla. 1991) (citing *Wallace*, 840 F.2d at 764-65) ("'embezzlement' and 'larceny' both require evil intent comparable to criminal *mens rea*").

the bankruptcy court did not address Cline's intent.[10] Elsewhere, however, the court found specifically that there was "no evidence [. . .] that Defendant intended to harm GMAC or that he knew an injury to GMAC was substantially certain to result from his actions." (Mem. Op. at *27). This finding related specifically to the corporate transfers (i.e., the same ones subjected to the embezzlement analysis), but occurred in the context of the bankruptcy court's analysis of GMAC's non-dischargeability claim based on willful and malicious injury under § 523(a)(6). This factual finding, which GMAC has not challenged, would appear to present an obstacle to any finding that Cline possessed the requisite fraudulent intent for purposes of embezzlement.[11] However, since the finding was made with respect to the § 523(a)(6) analysis, rather than under the § 523(a)(4) embezzlement analysis, the case must be remanded to the bankruptcy court for further proceedings. Specifically, the bankruptcy court must determine whether, in light of the court's factual findings, Cline possessed the level of intent needed to satisfy the third element of embezzlement.

---

[10] The issue of Cline's intent should have been settled by his failure to answer, and thus deeming admitted, the allegations of the complaint, *see* Fed. R. Civ. P. 8(b), in which GMAC accused Cline of intending to defraud GMAC. (*See* Compl. ¶¶ 1, 13, 18, 40, 43.) Following Cline's failure to answer, GMAC moved for and obtained a default judgment as to Cline's liability. Thus, in order for Cline to contest liability on GMAC's complaint after entry of the default judgment, the appropriate procedure would have been the filing of a motion to set aside the default judgment pursuant to Fed. R. Bankr. P. 9024, which incorporates Fed. R. Civ. P. 60(b). Nevertheless, Cline appeared at the damages hearing and was permitted to provide testimony that encompassed aspects of his liability on GMAC's claims set forth in the complaint, and was not limited to the amount of damages (which were not specified by the complaint), and the court relied upon Cline's testimony in making its factual findings. GMAC did not raise an objection to the bankruptcy court's allowing his testimony either at or after the hearing (*see* Mem. Op. at 6), nor does it challenge on appeal either the court's decision to allow Cline's testimony (which the bankruptcy court attempted to explain, *see id*. at *3-7) or the factual findings that resulted from it.

[11] As noted previously, this also makes it difficult to reconcile the bankruptcy court's conclusion that Cline committed larceny, which also requires fraudulent intent.

**IV. Conclusion**

      For the foregoing reasons, the bankruptcy court's decision is **REVERSED**. The case is **REMANDED** for further proceedings consistent with this opinion.

      **IT IS SO ORDERED**.

Dated: July 3, 2008

                                            
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**